

Cite as 2015 Ark. App. 475

# ARKANSAS COURT OF APPEALS

## DIVISION I
**No.** CV–15–280

| | |
|---|---|
| | Opinion Delivered September 16, 2015 |
| TREVOR MCKINLEY          APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. JV-2014-346-3] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE THOMAS E. SMITH, JUDGE |
|          APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Judge

Trevor McKinley appeals the termination of his parental rights as to two of his children: six-year-old A.M. and four-year-old E.M. McKinley argues that the circuit court erred as a matter of law in relying on a prior proceeding to find aggravated circumstances in the present case. We affirm.

In May 2014, the Department of Human Services (DHS) exercised a seventy-two-hour hold on four of McKinley's children: A.M. (then four years old), E.M. (then two years old), R.M. (then sixteen years old), and S.M. (then seventeen years old). The affidavit attached to DHS's petition for emergency custody explained that the Benton

County Sheriff's Department contacted DHS after Tammy and Mike Kirkpatrick, the parents of R.M.'s boyfriend, had contacted police to report that McKinley was impaired. McKinley was on his way to pick up R.M. at the Kirkpatricks' home, but after he had been told that the police would be there, he did not go to their house. Police officers visited the McKinley home and found pill bottles without labels and pills without bottles, both of which were alleged parole violations for McKinley. McKinley was present and was "high as a kite." Camille Williams, the family services worker, spoke with Amanda McKinley, the children's mother, who was "emotionally distraught," "confused," and "may have been impaired by substance abuse."[1] Due to inadequate supervision, DHS took the children into custody. The affidavit also noted DHS's prior history with the family, explaining that the children had been taken into DHS custody in December 2010 due to "Medical, Environmental and Educational neglect in addition to Mental Injury." At that time, DHS offered a multitude of services to the family, including drug screenings, transportation, medical services, visitations, home visits, parenting-education referral, counseling referral, and child-care referral.

An ex parte order for emergency custody was entered on May 9, and after a hearing on May 13, the circuit court entered a probable-cause order finding that return of the children to the custody of the parents was contrary to the children's welfare and that they should remain in the care and custody of DHS. The order noted that the case was

---

[1] Later pleadings revealed that while Amanda is A.M. and E.M.'s mother, the two older children have a different mother. Regardless, neither mother is a party to this appeal.

"continued to July 15, 2014, at 1:15 p.m., for an Adjudication Hearing and Termination of Parental Rights. Good cause is found for exceeding 30 days."

At a review hearing held June 24, both parents tested positive for several prescription drugs and methamphetamine. McKinley also tested positive for marijuana. Based on these test results and the testimony presented, the court suspended visitation with the children and ordered that the parents have no contact with the children. The court enjoined both parents from leaving the courthouse until 4:00 p.m., at which time Amanda would be allowed to drive if she could pass a field-sobriety test. McKinley was prohibited from driving a vehicle until further notice. The court ordered both parents to (1) provide documentation of all prescriptions, including when prescribed, why prescribed, and how many prescribed; (2) comply with pill counts conducted by DHS; and (3) "go to an inpatient drug treatment facility on this date and seek an immediate assessment as to whether they need to enter inpatient drug treatment."

On July 15, the court adjudicated the children dependent-neglected based on stipulation of the parties and found that the parents had "inadequately supervised the juveniles due to substance abuse." The case goal was set as reunification, but the court ordered no visits or contact with the children until the parents completed a substance-abuse assessment. The order also noted that a termination-of-parental-rights (TPR) hearing was scheduled for September 16.

On July 31, the children's ad litem filed a motion for no-reunification services with regard to S.M. and R.M., stating that R.M. did not wish to reunify with her parents and that S.M. would turn eighteen in October 2014 and wished to remain in foster care until

SLIP OPINION

that time. The motion asserted that the children had been subjected to aggravated circumstances in that there was little likelihood that services to the family would result in successful reunification. The motion noted the services previously offered to the family and stated that the parents had "failed to maintain sobriety and stability, despite services in excess of twelve (12) months previously."

Also on July 31, DHS filed a motion for termination of parental rights with regard to A.M. and E.M. DHS asserted that the children had been subjected to aggravated circumstances in that there was little likelihood that services to the family would result in successful reunification. As factual support, DHS cited the following: (1) the parents have continued to abuse drugs subsequent to the most recent removal of the juveniles and, despite provided referrals, have failed to use those services; (2) the juveniles were removed previously in 2010 due to mental injury and medical, environmental, and educational neglect, and the parents were provided a number of services, which resulted in the children being returned to parents. DHS also noted the following Child Abuse Hotline referrals:

> Referral #1502927:
> The ADHS found true on Trevor McKinley for punching [T.M.] in the face with a closed fist on or about November 6, 2010. . . . He admitted that he did this to [T.M.], his daughter, who was a juvenile at the time. [T.M.] is a sibling to the juveniles presently before the Court.

> Referral #1554780:
> The ADHS found true on Trevor McKinley and Amanda McKinley for Inadequate Supervision, Medical Neglect, Environmental Neglect, Educational Neglect, and Mental Injury regarding [R.M.], [S.M.], [A.M.], and [E.M.] on or about November 18, 2011. Trevor McKinley removed [R.M.] from mental health treatment against medical advice. [R.M.] was self-harming at the time. [S.M.] and [R.M.] missed significant amounts of school at the time because they were kept at home to care for the younger

siblings. At the home, the parents were asleep with [E.M.], age 3 months, propped up in front of the television with a blanket in her mouth. [A.M.] was in a dirty shirt with no diaper and no pants. [A.M.] was dirty. The home had a foul odor. The neonatologist for [E.M.] was unable to continue to advance the juvenile's medical treatment due to the parents' lack of care. This investigation resulted in the removal of the children into foster care.

. . . .

Referral #1689416:
The ADHS found true for inadequate supervision on Trevor and Amanda McKinley regarding [E.M.] and [A.M.] on or about May 8, 2014. The parents were visibly intoxicated and in possession of numerous pills and drugs that were not properly stored or labeled. [A.M.] and [E.M.] were found in a room of the house that was cluttered with food and clothing. The home was unkempt. The children were similarly unclean. This report resulted in the current episode of removal[.]

Based on its repeated attempts to make the family home safe and appropriate for the children, and the parents' failure to maintain the home and themselves appropriately, DHS asked that parental rights be terminated.

On September 24, the court held a no-reunification and TPR hearing. At the outset, McKinley's counsel moved to exclude testimony regarding the previous case, arguing that the last case closed successfully with reunification and that evidence from that case was irrelevant. The court declined to exclude testimony in its entirety but noted that it would consider objections as they arose.

R.M. testified that she was there to "hopefully terminate rights of my parents so that my little brother and sister don't have to grow up in that lifestyle." She testified that in May 2014, she and her parents were not getting along, that her parents were on methamphetamine, that she and S.M. were the primary caregivers for the younger children, and that the house was messy. She stated that her parents were always sleeping

or doing drugs. She said that they mainly took pain pills and that some of them were prescribed, but that her father would run out of his pills too quickly and sometimes asked her to get pills for him. She explained that this behavior occurred between March 2013, when she returned home, and May 2014, when she returned to foster care. She also testified that both of her parents were using methamphetamine during that time. Counsel again argued that this testimony was irrelevant, but the court found that "[e]verything that happened since the children returned in 2013, until they were taken, is evidence. It's very relevant to determine whether or not there's a likelihood, and whether or not it meets aggravating factors[.]"

R.M. testified that there were also domestic-violence issues between her parents, some of which occurred in front of her and the other children. She explained that after she and the other kids were returned to their parents, she had to miss a lot of school to help take care of the younger children. She stated that she wanted to report what was going on, but at the same time, she did not want to return to foster care, so she thought it would be easier if she took care of the kids. On cross-examination, R.M. explained that her dad had several health issues, including Hepatitis C, psoriasis, and arthritis, and that she felt sorry for him. She also felt that his mental health was "the most crippling thing" and that he dealt with depression.

Amanda McKinley testified that there were substance-abuse issues in the 2010 case but that neither she nor Trevor was sent to treatment. Instead, DHS helped them monitor their medications with pill counts and "stuff like that." She stated that from March 2013 to May 2014, when the children were back in their care, she and Trevor did

not abuse medications or use illegal drugs. She acknowledged that R.M. did help them take care of the children but claimed it was only for brief periods. She admitted that there was domestic violence during that time but only between her and Trevor. She acknowledged that R.M., A.M., and E.M. were in the home when it occurred. Contrary to her earlier statement, Amanda also stated that neither she nor her husband had a substance-abuse problem, not in 2010 or now.

Regarding this case, Amanda acknowledged that she and Trevor attended a staffing at the end of June, right after the probable-cause hearing, and that she knew DHS wanted her and Trevor to have a drug assessment. She admitted that, at the end of June, she and Trevor had attended a hearing while intoxicated on methamphetamine. She agreed that DHS had repeatedly addressed issues of inadequate supervision, environmental neglect, and substance abuse in her family, and that services had been offered to help with those problems. She agreed that those services had been beneficial enough to allow her kids to come home, but when asked what had happened between March 2013 and May 2014 to cause the situation to decline, Amanda said, "I don't know how to answer that." She agreed that the present situation could be better and that they were "somewhat" back to where they were in 2010.

Camille Williams, the family services worker assigned to the McKinleys, testified that DHS had been involved with the family since 2010. Williams explained that there had actually been two previous removals, one in 2010 and another in 2011. In 2010, T.M. was removed after the physical-abuse incident, and DHS opened a protective-services case. The other children were then removed in 2011 due to environmental

neglect, inadequate supervision, and mental injury. Williams stated that in 2010 and 2011, DHS offered the following services to the McKinleys: transportation, worker visits, foster-family house, residential treatment, individual counseling, clothing, medical services, psychological evaluations, visitation, hair-follicle referrals, anger-management referral, marriage counseling, substance-abuse services, drug testing, visitation with the juveniles, and child-care referral. Williams explained that DHS was now recommending no reunification for the two older children and termination for the two younger children because "the services that we've offered before, while maybe successful temporarily, weren't successful over the long-haul, and I think that these children deserve a long-haul solution."

Williams stated that DHS has addressed substance-abuse issues with the McKinleys, including a referral for them to be assessed in the present case, and that she has helped them when they asked for help. She referred them to individual counseling after the staffing in June 2014, and attempted to contact them several times in July, but was unsuccessful in doing so. She stated that DHS never received a list of their prescriptions as ordered by the court in June. She testified that the parents had been "generally very noncompliant" and agreed that there was no service that DHS could offer to these parents to address the issues in their home that had not already been offered and failed. She also stated that the two younger children were adoptable and that she feared for their safety if returned to their parents. Williams admitted that the written case plan was filed late but stated that the services in the case plan are the same as those discussed at the staffing that the parents attended.

On cross-examination, Williams agreed that the parents were entitled to a written case plan and that the case plan was not filed until that day—the day of the TPR hearing. She explained that the most recent reports from the parents' drug assessments indicated that Amanda should receive outpatient counseling and Trevor should receive inpatient treatment and, after receiving the reports, Williams spoke with Decision Point about arranging the services that had been recommended. Williams also referred both parents to individual counseling and gave them a schedule for parenting classes. But she agreed that she was recommending that services be stopped because they would not be successful. She also agreed that there was "some success" in the last case plan but that "to say it was successfully completed would be to ignore the fact that we're here now." She reiterated that DHS had been providing some services, such as drug screens, during this most recent case and explained that since the probable-cause hearing the goal of the case had been TPR.

Finally, Williams disclosed that she received a phone call from Amanda the previous week and that Amanda said that the children should not come home. According to Williams, Amanda "understood they were with very loving foster parents, and that's where she wanted her kids to grow up, because they can provide a more stable environment than could be provided . . . at her home." Williams expressed concern for Amanda's safety and agreed that it affected the safety of the children in returning to the home.

Keith Wright, an intake specialist for Decision Point, testified that Trevor McKinley was interviewed on August 25 and that his assessment indicated a need for

substance-abuse treatment in a residential-treatment program. Wright testified that McKinley later made contact with an intake screener and that he was referred for detoxification at another facility.

After Wright's testimony, the hearing was continued until October 7. On that date, McKinley testified that he was referred for a drug-and-alcohol assessment in this case and that he took that assessment on August 25. He stated that he had tried to obtain a drug-and-alcohol assessment before that date but was unable to pay for it. He testified that he never received a report of his assessment and that he did not receive any other referrals from DHS. He also did not receive a written case plan. He explained that he attempted to get inpatient treatment at the end of September but was unsuccessful. He denied using any illegal drugs and stated that he had stopped taking his pain medications "to appease the court."

McKinley also testified that R.M. wanted to quit school because she did not fit in and that she was not left alone with the other children all the time. He acknowledged that she was a big help with the children but "was by no means watching the kids more than any other children at her age would do for a family member." He expressed willingness to perform any services necessary to reunite with his children and stated that their home environment was appropriate for children. He denied that any problems, such as inadequate supervision or educational neglect, existed in the home, and he opined that such problems had never existed, even in the previous case. He also stated that he did not believe his wife had called DHS and said that the children should not be returned. He admitted attending a staffing for this case and talking about what needed to be done, but

he stated that they never received a case plan and did not know what needed to be done to get the children back. According to McKinley, he told Williams that he wanted to work to get his kids back and asked what to do, and Williams told him that he was not getting his kids back. He stated that his requests for a case plan and services were ignored. He also did not recall stipulating that the children were dependent-neglected at the adjudication hearing.

Amanda McKinley was recalled to the stand and denied that she had called Williams and told her the children should not be returned. Amanda suspected that her next-door neighbor made the call. Camille Williams was also recalled to the stand and testified that the person who called her identified herself as Amanda and sounded like Amanda. Williams said that she also talked to Susan McNeil, Amanda's neighbor, who was there with Amanda.

In closing arguments, DHS argued that it had offered extensive services to this family from 2010 to 2013 "that were pretty much directly on-point with the kinds of things we've been doing in this case." DHS acknowledged that the case plan was filed late but explained that the lateness was due to some confusion over whether a case plan was needed, as this case was set for termination at the probable-cause hearing. DHS reiterated that there was little likelihood of services being successful in this case.

McKinley's counsel argued that DHS had not met its burden in proving little likelihood that services would be successful and that DHS was prohibited from making this case "a continuation of the last one." Counsel asserted that DHS had not made

reasonable efforts or provided any services in a timely manner, and before they could conclude that services would not be successful, some services had to be provided.

The children's attorney ad litem argued that DHS had worked this case "for quite some time, the first time around" but that "as soon as the Department was out of their business, [the parents] went straight back to doing the exact same thing that they had done to cause the children to be removed the first time." The ad litem argued that the parents "have shown repeatedly that they will not, and cannot, provide a safe home" and that parental rights should be terminated as to A.M. and E.M.

In its oral ruling, the court found that it was in the children's best interest to enter a no-reunification order as to R.M. and S.M. and a termination order as to A.M. and E.M. The court found by clear and convincing evidence that there was little likelihood that any services in this case would result in reunification. The court noted that it was strongly influenced by R.M.'s testimony and Amanda's call to DHS. The court was "alarmed" that there was not a case plan filed sooner but noted that the parents had been ordered to get a drug assessment and any necessary treatment by the court, independent of the case plan, and the parents did not follow those orders.

An order for no-reunification services as to S.M. and R.M. was filed in October 2014, and an order terminating parental rights to A.M. and E.M. was filed in January 2015. In the termination order, the court found that the parents "have never really resolved their issues with substance abuse" and that "[b]etween the two cases involving this family, the parents have had over 12 months of services and yet the supervision and substance abuse issues remain an impediment to the safe return of the juveniles to the

parents." The court found little likelihood for successful reunification "because of the lack of rehabilitation in the last case and lack of progress in this case." McKinley filed a timely notice of appeal from both orders.

A circuit court's order that terminates parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2013); *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is proof that will produce in the fact-finder a firm conviction on the allegation sought to be established. *Dinkins*, *supra*. On appeal, we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit judge to assess the witnesses' credibility. *Id.*

On appeal, McKinley's argument addresses only the termination order, so any argument that the no-reunification order was entered in error has been abandoned. *See Hunter v. Runyan*, 2011 Ark. 43, 382 S.W.3d 643 (arguments not advanced on appeal must be deemed abandoned). Likewise, McKinley does not challenge the circuit court's finding that termination was in the children's best interest. Instead, McKinley's appeal focuses solely on the statutory ground for termination—aggravated circumstances—relied on by the circuit court.[2]

---

[2] Out of an abundance of caution, McKinley also discusses the "twelve months/failure to remedy" ground, but it is clear that this ground was not alleged in the petition to terminate. Thus, even if the circuit court did rely on this ground, which is

Aggravated circumstances are present when "a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification." Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*)(*3*)(*B*)(*i*). McKinley argues that the circuit court erred in finding aggravated circumstances in the present case because (1) the prior case closed after he had successfully reunited with his children and (2) he had no opportunity to demonstrate progress in the current case because no services had been offered to him. He acknowledges that he was provided a plethora of services in the first case, but contends that in this case, there was no case plan filed, no services offered, and no referrals made until the end of July, only a few days before DHS filed the petition to terminate parental rights. McKinley asserts that the goal of the case was reunification, and until that was changed, he should have been offered services. Because of the almost complete lack of services in the present case, McKinley argues that the circuit court erroneously relied on his actions in the prior proceeding to make its aggravated-circumstances finding.

McKinley likens his case to *Williams v. Arkansas Department of Human Services*, 2013 Ark. App. 622. There, Williams was in jail when his children were taken into custody, but his parental rights were later terminated because he did not remedy the conditions that caused the removal. This court held that the "failure to remedy" ground could not apply to Williams because his actions did not cause the removal. DHS argued that Williams had

---

questionable, it could not be used to support a termination finding. *See Jackson v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 411, 429 S.W.3d 276. Further, because proof of only one statutory ground is necessary to terminate parental rights, *Gossett v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 240, 374 S.W.3d 205, we need not address the possible application of this alternative ground.

been the cause for removal in a previous case involving all but one of the children, but we declined to consider the case as a continuation of the previous dependency-neglect case. McKinley argues that this is exactly what the circuit court did in this case: used the actions of a parent in a previous proceeding as the sole ground for termination.

DHS agrees that if "failure to remedy" is the statutory ground relied on, then events in a prior dependency-neglect case cannot be considered. But if "failure to remedy" is not the sole statutory ground, then the prior events can be considered in termination: "[W]e recognize that the trial court is free to consider the parent's actions in previous dependency proceedings in determining the appropriateness of termination[.]" *Williams*, 2013 Ark. App. 622, at 5. DHS contends that the issue in this case is whether McKinley's history can support a finding that there is little likelihood that services would result in successful reunification and, under *Williams*, considering McKinley's actions in the previous, closed dependency case was not erroneous.

We agree that the circuit court did not err in considering the previous case. On this point, *Chapman v. Arkansas Department of Human Services*, 2014 Ark. App. 525, 443 S.W.3d 564, is instructive. In that case, DHS had worked with the family for seven years and removed the child three times; although the child was returned to the parents twice, reunification was not successful because the end result was a subsequent removal. The circuit court terminated parental rights on the aggravated-circumstances ground, finding that there was little likelihood that additional services would result in a successful reunification, after considering "all the services provided to the parents over a seven-year period and the parents' inability to permanently correct the conditions causing the

15

removal." *Id*. at 5. This court held that the court's finding on this ground was not clearly erroneous. Given this holding, and the statement in *Williams* that the circuit court "is free to consider the parent's actions in previous dependency proceedings in determining the appropriateness of termination," we hold that the circuit court did not err in considering the previous case.

We also disagree that the previous case was the sole basis for the circuit court's aggravated-circumstances finding. The court also considered R.M.'s testimony demonstrating abuse and neglect after the children had been returned home; McKinley's ongoing drug use, including drug use occurring after the children had been removed in the present case; and McKinley's failure to follow the court's June 24 order regarding prescription-drug use and residential treatment. We find no clear error in the circuit court's decision and affirm the termination of McKinley's parental rights.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Mischa K. Martin*, County Legal Operations, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.