

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-16-1027

REBECCA LADD

APPELLANT

V.

ARKANSAS DEPARTMENT OF
HUMAN SERVICES AND MINOR
CHILD

APPELLEES

**Opinion Delivered:** September 6, 2017

APPEAL FROM THE CLEBURNE
COUNTY CIRCUIT COURT
[NO. 12JV-15-13]

HONORABLE LEE WISDOM
HARROD, JUDGE

AFFIRMED

**BART F. VIRDEN, Judge**

The Cleburne County Circuit Court terminated the parental rights of appellant Rebecca Ladd (now Pompa) to her daughter, H.H. (DOB: 12/27/2008).[1] On appeal, Pompa argues that the trial court erred (1) in terminating her parental rights because the Arkansas Department of Human Services (DHS) failed to prove grounds and (2) in terminating reunification services. She does not challenge the trial court's best-interest determination. We affirm.

## I.     *Procedural History*

On January 23, 2015, DHS filed a petition for emergency custody and dependency-neglect concerning H.H. based on parental unfitness due to continued drug use by Pompa. Attached to the petition was the affidavit of DHS family-service worker, John Seward. He

---

[1]The trial court also terminated the parental rights of H.H.'s father, Kevin Hussman, but he is not a party to this appeal.

attested that on January 7, 2015, Pompa tested positive for methamphetamine and THC.[2] Because H.H.'s maternal grandmother lived in the home and had agreed to provide care and supervision for H.H., DHS requested a "less-than-custody" order prohibiting Pompa from using illegal drugs. In the affidavit, Seward attested that DHS's first contact with the family was on February 2, 2010, with a true finding for neglect and failure to protect H.H.; however, the case was closed when the parents moved to New Mexico. He stated that on March 25, 2011, H.H. first came into foster care in Arkansas because of inadequate supervision due to the parents' drug use but that H.H. was returned to Pompa's custody on August 22, 2012. Seward said that on January 4, 2013, H.H. came into foster care again due to Pompa's inadequate supervision by permitting Hussman, whom she knew to be using methamphetamine, to care for H.H. on several occasions. On June 6, 2014, H.H. was returned to Pompa's custody; however, DHS continued to monitor the family. Seward stated that, during that time, Pompa tested positive for THC several times, so DHS made a referral for outpatient drug treatment. Pompa attended a couple of sessions and then began missing appointments.

The trial court issued an ex parte order prohibiting Pompa from using illegal drugs and warning her that she risked having H.H. placed in DHS's custody if she continued her drug use. Pompa stipulated that probable cause existed for the emergency order and agreed to the protection plan involving supervision of H.H. by Pompa's mother, Ruth Towell-Wright. An adjudication hearing was scheduled for February 18, 2015.

---

[2]Tetrahydrocannabinol (THC) is the main chemical compound found in marijuana.

On February 3, 2015, DHS filed another petition for emergency custody and dependency-neglect concerning H.H. on the basis that Pompa had continued to use illegal drugs. In an affidavit attached to the petition, DHS family-service-worker supervisor, Johnelle Switzer, attested that on February 1, 2015, DHS was contacted by the police because someone in the community had seen Pompa parked at an apartment smoking drugs from a glass pipe. Pompa was stopped by the police, and she admitted having used methamphetamine the previous day. On February 2, 2015, Pompa was ordered to submit to a drug test. She could not produce a sample but admitted that she had used methamphetamine. Pompa also admitted having taken H.H. to live with Amy Armstrong in Little Rock in an effort to keep the child out of foster care. DHS took a seventy-two-hour hold on H.H. In an adjudication order entered February 27, 2015, Pompa stipulated to the dependency-neglect finding based on parental unfitness due to continued drug use. An ex parte order for emergency custody issued, making a second probable-cause hearing necessary. The trial court found that probable cause existed for H.H. to remain in DHS's custody and that DHS had provided reasonable services, including drug screens and referrals for drug treatment.

On April 13, 2015, DHS filed a motion to terminate reunification services, alleging that H.H. had been subjected to aggravated circumstances, specifically, that there was little likelihood that additional services would result in successful reunification. DHS alleged that it had been involved with the family since March 2011, that H.H. had been taken into foster care three times due to illegal drug use by her parents, that extensive services had been

offered, and that continued services would not likely result in permanent reunification due to the parents' continued drug use, noncompliance, and lack of stable living conditions.

On July 14, 2015, a review order was entered. The trial court noted that DHS had requested not to proceed yet on its motion to terminate reunification services. The court stated that the goal continued to be reunification and found that DHS had made reasonable efforts to achieve that goal by offering, among other things, drug screening, referrals for drug treatment, drug assessments, mental-health counseling, family counseling, parenting classes, home visits, and transportation. The trial court found that Pompa was not in compliance with the case plan and ordered her to submit to and complete inpatient drug treatment.

DHS filed a petition for termination of both Pompa's and Hussman's parental rights on July 15, 2015, alleging grounds under Ark. Code Ann. § 9–27–341(b)(3)(B)(i)*(a)* (twelve-month failure to remedy), (ii)*(a)* (failure to provide significant material support and maintain meaningful contact), (iv) (abandonment by Pompa's willingness to consent to the adoption of H.H. if she could choose the adoptive parents), (vii)*(a)* (other subsequent factors), and (ix)*(a)* (aggravated circumstances in that there was little likelihood of successful reunification). A hearing was held on October 28 and continued on October 30, 2015.

II.     *Hearing Testimony*

John Seward testified that DHS first became involved with Pompa in March 2011 and that it was "one continuous protective-services case" since then totaling approximately fifty-five months. According to Seward, Pompa tested positive for THC on July 29, 2015, and started inpatient drug treatment on August 3, 2015, which she completed on September

2, 2015. He stated that Pompa was still attending outpatient drug therapy. He said that "on the surface, she has stopped using drugs for now." He conceded that Pompa was doing the things she needed to do to address her drug addiction but pointed out that it would be an ongoing problem for any addict. He said that Pompa had shown that she can stay clean for four to six months at a time but that she "falters again." Seward said it appeared that Pompa could get sober as long as DHS was monitoring her. He stated that, if not for the history of the two previous cases, DHS would have possibly recommended increasing visitation.

Seward said that Pompa had regularly attended visits with H.H.; that she was doing well with her counseling; that she was employed at a nursing home; and that her home was appropriate. Seward said, however, that Pompa's new husband, Manuel, had quit his job as a truck driver and was finishing outpatient drug treatment. Seward testified that H.H.'s current foster parents wanted to adopt her and that DHS was recommending termination of Pompa's parental rights.

Johnelle Switzer testified that when the case was opened by DHS in 2011, H.H. remained in foster care for twelve months before Pompa began to comply with the case plan; a trial home placement occurred after fifteen months; and H.H. was returned to her mother after a total of seventeen months. In January 2013, H.H. was placed in foster care where she stayed another seventeen months. Switzer said that DHS was ordered to keep the protective-services case open for at least ninety days. She said that she had kept the case open for longer than ninety days based on environmental issues and positive drug screens for methamphetamine. Switzer said that, in her experience, people who have had multiple relapses do not usually end up successfully "kicking the habit." She said that there is no

permanency for a child when DHS returns custody of a child to the parent only to take that child into custody again after a few months or even a year later. Switzer said that Pompa was facing that day the same challenges she had faced in March 2011. She said that she thought Pompa needed at least one year of sobriety before DHS would no longer have concerns because of Pompa's history of relapsing. Switzer said that Pompa had married Manuel in September 2015 and that he had failed drug screens. She said that Pompa's choice to marry another drug user concerned her.

Karissa Clemons testified that she has been H.H.'s foster parent since February 2, 2015, and that H.H. is doing very well. Winter Yielding, a licensed professional counselor, testified that H.H. had become her patient in April 2015 and that H.H. suffered from depression and anxiety. Yielding said that H.H.'s symptoms were characteristic of a child with major life changes, such as going into the foster-care system, and that her symptoms were also the result of instability and early unmet emotional needs. Yielding said that H.H. looked forward to visits with Pompa, but Yielding attributed H.H.'s improvement to her current attachment to her foster family where she experienced stability.

Pompa testified that she is currently twenty-eight years old, that she began using marijuana when she was eight years old, and that she had used methamphetamine for nine or ten years. She said that she had smoked marijuana "every day, every minute of every hour" and later said that she smoked five or six joints per day. Pompa said that, after H.H.'s most recent removal from her custody, she (Pompa) continued to smoke marijuana for two or three months and that Manuel had used marijuana with her. She said that Manuel had left his job because of her drug use and H.H.'s removal from the home. She claimed that

she had last used marijuana in June 2015 and had last used methamphetamine around the end of January 2015. Pompa said that she had relapsed on methamphetamine because she "was bored" and "went to see some old acquaintances that [she] shouldn't have." Pompa said that she had not yet completed her outpatient drug treatment or her mental-health counseling. She said that her outpatient drug treatment could end in three to six months but that she had not been given a completion date for the counseling. She said that she had made a promise to herself that she would never touch drugs again because of the consequences she now faced. Pompa said that she had learned from her mistakes and had turned her life over to a higher power.

Pompa testified that she had met Manuel on Plenty of Fish, an online dating website, and that he had been there for her and had stepped up to be H.H.'s stepfather. She said, whereas before she had tried to quit drugs on her own with no help and had failed, she now has a wonderful man who supports her. She said that she and Manuel attend Celebrate Recovery every week and that her counselor held group meetings that resembled Narcotics Anonymous meetings, which was "over and above the case plan." She could, however, identify only two steps of the twelve-step program and stated that she had no sponsor yet.

Manuel testified that he is currently twenty-eight years old and that he had begun using marijuana once a week when he was twenty. He testified that he had known Pompa since November 2012 and had used drugs with her in 2012. He said that he did not use drugs in 2013 or 2014 but used again in 2015. Manuel said that he had stopped smoking marijuana in June 2015 "because it's no good" and made him sleepy and lazy. He said that he had never been to drug rehab.

Deborah McDonald, a volunteer for CASA (Court Appointed Special Advocates), testified that she had worked on the case involving Pompa and H.H. since March 2011 and that she recommended termination of Pompa's parental rights.

### III.    *Additional Procedural History and Trial Court's Findings*

A review order was entered on March 14, 2016, and the trial court noted that a hearing on DHS's petition to terminate parental rights had been held on October 28 and 30, 2015, but that a decision had been delayed due to difficulties obtaining a transcript. A hearing scheduled for April 13, 2016, was continued until May 13, 2016, at which time the trial court stated that it would announce its decision. On August 15, 2016, the trial court entered a posttermination permanency–planning order, an order granting DHS's motion for no reunification services, and an order granting DHS's motion to terminate parental rights.

In its order granting the motion for no reunification services, the trial court found that H.H. had been subjected to aggravated circumstances in that there was little likelihood of successful reunification. The trial court went through the history since 2010 and noted that H.H. had been placed in foster care three times due to continued drug use by her parents or Pompa's poor decision–making. The trial court stated that H.H. had had an open DHS case, whether court ordered or noncourt involved, for approximately fifty-five months and had spent over half her life in foster care. The trial court stated that, although Pompa had been sober for a few months, her drug rehabilitation had been a work in progress for years and that it was "cyclic improvement followed by relapse." The trial court concluded that termination of reunification services was in H.H.'s best interest.

In its order terminating Pompa's parental rights, the trial court found that H.H. had been subjected to aggravated circumstances in that there was little likelihood of successful reunification with H.H. The trial court specifically found that the testimony of Pompa and her husband Manuel was not credible. The trial court made many of the same findings as in the no-reunification-services order. The trial court found that termination of parental rights was in H.H.'s best interest and said that "at some point, enough is enough." The court concluded that Pompa lacked the capacity to remain permanently drug free and that H.H. would be at risk of harm if returned to Pompa's custody. The trial court also found that H.H. is adoptable, specifically, her current foster parents wished to adopt her.

## IV.    *Standard of Review*

We review termination-of-parental-rights cases de novo. *Williams v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 622. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Id.* The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). On appellate review, this court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties before it. *Id.* Termination

of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Friend v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670.

## V.  *Discussion*

Pompa argues that the trial court erred in terminating her parental rights and likewise erred in terminating reunification services. Pursuant to Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2015), an order forever terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood that the juvenile will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The order must also find by clear and convincing evidence one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). Here, the trial court relied on the aggravated-circumstances ground in section 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*. "Aggravated circumstances" means, among other things, that a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*.

An order terminating reunification services and ending DHS's duty to provide services to a party shall be based on a finding of clear and convincing evidence that the termination of reunification services is in the child's best interest and that one or more grounds exist, including a determination by a circuit court that there is little likelihood that

10

services to the family will result in successful reunification. Ark. Code Ann. § 9-27-365(c)(1) & (2)(A)(v).

Pompa argues that this case began in January 2015 when she tested positive for drugs and that, although she tested positive again in July 2015, she was otherwise compliant with the case plan and was doing what she needed to do to regain custody of H.H. Pompa argues that DHS admitted that if her progress had continued, it would have eventually been enough for her to regain custody of H.H. Pompa points out that she was successful twice before in reunifying with H.H., so that "would seem to suggest a decent likelihood of reunification here." Pompa says, "Under DHS's doublespeak, past success is a predictor of future failure. It didn't matter how Ms. Pompa did this time around; her history of *complying* with DHS requirements twice before renders compliance this time meaningless."

After H.H.'s most recent removal in February 2015, Pompa failed only one drug test. She had completed inpatient drug treatment and was complying by attending outpatient drug treatment and counseling. She also had secured a job and an appropriate home. While her progress is commendable, even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Shaffer v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 208, 409 S.W.3d 182. The trial court was not convinced that Pompa would not return to drugs.

Pompa has consistently failed to keep her child out of foster care by returning to drugs each time custody of H.H. has been returned to her. Pompa's "multiple successful" drug treatments could also be described as "multiple failures," given that drug treatment and rehab has as its goal the cessation of drug use. Pompa has had drug treatment and has been

receiving other services from DHS since at least March 2011, yet she could not identify all twelve steps of the NA program and had not grasped the importance of having a sponsor. At the time of the termination hearing, Pompa had been sober approximately three months given that she tested positive for drugs near the end of July 2015. She would have liked the trial court to overlook her past failures and noncompliance, but evidence that H.H. had been in and out of foster care over a seven-year period was relevant to H.H.'s best interest, the likelihood of a successful reunification, and the potential harm to H.H. *See Chapman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 525, 443 S.W.3d 564. The trial court was free to consider Pompa's actions in previous dependency-neglect proceedings in determining whether termination was appropriate. *McKinley v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 475, 471 S.W.3d 209. A parent's past behavior is often a good indicator of future behavior. *Shaffer, supra.*

The purpose of the termination-of-parental-rights statute, Ark. Code Ann. § 9-27-341(a)(3), is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective. H.H. needs permanency, and her current foster parents would like to adopt her. The child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances. *Shaffer, supra.* Pompa has been given numerous chances to benefit from services and keep her daughter with her, but she has returned to drugs each time. We

cannot say that the trial court clearly erred in terminating Pompa's parental rights and, for the same reasons, in terminating reunification services.

While Pompa addressed the other grounds alleged in DHS's petition, aggravated circumstances was the only ground relied on by the trial court to support termination with respect to Pompa, and proof of only one statutory ground is sufficient to terminate parental rights. *Sharks v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 435, 502 S.W.3d 569.

Affirmed.

GLADWIN and BROWN, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Mary Goff*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.